**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ULTRA PREMIUM SERVICES, LLC d/b/a TMK IPSCO and, | § § § | |
| IPSCO TUBULARS INC. d/b/a TMK IPSCO, | § § § | |
| Plaintiffs, | § § § | UNREDACTED VERSION FILED UNDER SEAL |
| v. | § § | CIVIL ACTION NO. 4:19-cv-02277 JURY |
| OFS INTERNATIONAL, LLC, | § § | |
| OILFIELD SERVICES AND TECHNOLOGIES, LLC, | § § § | |
| THREADING AND PRECISION MANUFACTURING, LLC, and | § § § | |
| FERMATA TECHNOLOGIES, LLC, | § § § | |
| Defendants. | § | |

### PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Ultra Premium Services, LLC d/b/a TMK IPSCO ("Ultra") and IPSCO Tubulars Inc. d/b/a TMK IPSCO ("IPSCO Tubulars Inc.") (collectively, "IPSCO") by and through their undersigned counsel, file this Second Amended Complaint against OFS International, LLC ("OFS International"), Oilfield Services and Technologies, LLC ("OFS&T"), Threading and Precision Machining, LLC ("TPM") (collectively, "OFSi") and Fermata Technologies, LLC ("Fermata").

### NATURE OF THE ACTION

1.       This is an action for breach of contract, as well as violations of the Defend Trade Secrets Act of 2016 ("DTSA", 18 U.S.C. § 1836 *et seq.*) and the Texas Uniform Trade Secrets Act ("TUTSA", Texas Civil Practice and Remedies Code § 134A.001, *et seq.*).

2.     On April 25, 2013, Ultra and TPM entered into a License Agreement – Manufacturing (the "Original Manufacturing Agreement").

3.     On June 30, 2014, Ultra and OFS&T entered into two agreements: License Agreement – Sales and Marketing (the "Sales Agreement," attached as Exhibit 1) and License Agreement – Manufacturing (the "Manufacturing Agreement," attached as Exhibit 2).   On December 12, 2016, Ultra and OFSi entered into two similar agreements:  License Agreement – Sales and Marketing (the "Second Sales Agreement," attached as Exhibit 3) and License Agreement – Manufacturing (the "Second Manufacturing Agreement," attached as Exhibit 4).  On December 11, 2018, Ultra and OFSi entered into two more agreements entitled License Agreement – Sales and Marketing (the "Third Sales Agreement," attached as Exhibit 5) and License Agreement – Manufacturing (the "Third Manufacturing Agreement," attached as Exhibit 6).  The Sales Agreement, Manufacturing Agreement, Second Sales Agreement, Second Manufacturing Agreement, Third Sales Agreement, and Third Manufacturing Agreement are referred to collectively as "the Agreements."

4.     Additionally, on July 31, 2014, IPSCO Tubulars Inc. and OFS International entered into a Non-Disclosure and Confidentiality Agreement ("OFSi NDA").  On the same day, IPSCO Tubulars Inc. entered into an identical Non-Disclosure and Confidentiality Agreement with OFS&T ("OFS&T NDA") (collectively, the "NDAs").

5.     OFSi has manufactured and sold a variety of products licensed under the Agreements ("IPSCO Products").   Recently, OFSi has begun manufacturing and marketing identical or nearly identical products using its own brands and product names ("OFSi Products").  A comparison of the technical data sheets reveals the specifications of the OFSi Products are nearly identical to the IPSCO Products.  Additionally, the technical data sheets for the OFSi Products

contain images that are obvious copies of the product images on IPSCO's respective technical data sheets.

6. OFSi's manufacturing and sale of these OFSi Products breach several provisions of the Agreements, including confidentiality provisions in the Agreements, and licensed product provisions in the Manufacturing Agreement, Second Manufacturing Agreement, and Third Manufacturing Agreement. It also violates the DTSA and TUTSA. In addition, OFSi has breached the royalty provisions in the Sales Agreement, Second Sales Agreement, and Third Sales Agreement. Furthermore, OFSi has, in breach of the Agreements, disclosed IPSCO's confidential information to Fermata.

7. Fermata, ███████████████████████████████ has received IPSCO's confidential information and is using IPSCO's confidential information to "design" OFSi's products.

8. Under the Agreements, OFSi agreed that if it breached any material term of the respective agreement, IPSCO is entitled to temporary and permanent injunctive relief.

9. OFSi has breached the Agreements and has willfully and maliciously misappropriated IPSCO's trade secrets. Plaintiffs thus seek, in addition to actual and exemplary damages, permanent injunctive relief against OFSi. Furthermore, pursuant to the Agreements IPSCO is entitled to attorneys' fees and costs as a result of OFSi's breach.

## PARTIES

10. Plaintiff Ultra Premium Services, LLC is a Delaware limited liability company with a principal place of business at 10120 Houston Oaks Drive, Houston, Texas 77064. Ultra does business under the name TMK IPSCO.

11. Plaintiff IPSCO Tubulars Inc. is a Delaware limited liability company with a

principal place of business at 10120 Houston Oaks Drive, Houston, Texas 77064.  IPSCO Tubulars Inc. does business under the name TMK IPSCO.

12. Defendant OFS International, LLC is a Delaware limited liability company with a principal place of business at 7735 Miller Road Number 3, Houston, Texas 77049.

13. Defendant Oilfield Services and Technologies, LLC is a Delaware limited liability company with a principal place of business at 7735 Miller Road Number 3, Houston, Texas 77049.

14. Defendant Threading and Precision Manufacturing, LLC is a Delaware limited liability company with a principal place of business at 7735 Miller Road Number 3, Houston, Texas 77049.

15. Defendant Fermata Technologies, LLC is a Texas limited liability company with a principal place of business at 7735 Miller Road Number 3, Houston, Texas 77049.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action under the Defend Trade Secrets Act.  18 U.S.C. § 1836, *et seq*.

17. This Court has supplemental jurisdiction over IPSCO's claims under Texas law under 28 U.S.C. § 1367 because all claims asserted herein are based on a common nucleus of operative facts.

18. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to IPSCO's claims occurred in this district and division and the harm that IPSCO has suffered and will continue to suffer as a result of OFSi's unlawful actions occurred in this district and division.  Venue is also proper in this Court pursuant to the terms of the Manufacturing Agreement, Second Manufacturing Agreement, and Third Manufacturing Agreement in which OFSi agreed that any legal proceeding shall be brought in a

United States court in Texas. Venue is also proper in this Court pursuant to identical provisions in the Sales Agreement, Second Sales Agreement, and Third Sales Agreement.

## FACTUAL BACKGROUND

19. IPSCO designs and produces connections for steel tubular goods used in oil and gas wells. It owns several patents and patent-pending applications and has knowledge and confidential design information, trademarks, and other intellectual property related to the manufacturing and threading of these connections. Ultra is a subsidiary of IPSCO Tubulars Inc., which is one of the largest producers in the United States of steel tubular products for use in oil and gas wells, pipelines, structural applications, and other purposes.

20. The IPSCO designed connections include proprietary and patented characteristics that, when manufactured on steel tubulars used in oil and gas wells ("OCTG," which is an abbreviation for Oil Country Tubular Goods), are used to connect one piece of OCTG to another. OCTG is generally purchased by operators of drilling rigs engaged in the exploration for, and production of, oil and natural gas. The IPSCO designed connections are highly engineered products, which take years and significant financial investment to develop.

21. OFSi provides oilfield services including field services, yard services and rig returns, inspection, threading and coupling, and accessories. OFSi touts that it "is in a unique position of being able to offer premium connections including the manufacture of premium couplings." OFSi, www.ofsint.com/about-us (last visited Dec. 4, 2019). Along with Independent Inspection Services, LLC, TPM and OFS&T are two wholly-owned subsidiaries of OFS International.

22.     TPM "provides OCTG threading support for the oil and gas industry," by manufacturing couplings and threading connections, including premium and semi-premium connections.  *See* OFSi, https://ofsint.com/services/threading/ (last visited Dec. 4, 2019).

23.     OFS&T "provides a wide range of products and services supporting drilling and completion operations."  OFSi, https://ofsint.com/services/ (last visited Dec. 4, 2019).  OFS&T also provides field services related to OCTG products.  OFSi, https://ofsint.com/services/ofst-field-services/ (last visited Dec. 4, 2019).

**Relationship between IPSCO and OFSi**

24.     IPSCO and OFSi had a long and close working relationship.  OFS International was initially created in October 2012 under 100% common ownership with IPSCO to provide machine shop, inspection, and related services.  TPM was created as a wholly-owned subsidiary of OFS International.  OFSi began operating in April 2013.

25.     On April 25, 2013, Ultra and TPM entered the Original Manufacturing Agreement, which gave TPM access to IPSCO's confidential information for the purpose of manufacturing certain enumerated Licensed Products, including the Ultra DQX.  TPM became one of a limited number of companies licensed to use some of IPSCO's proprietary thread designs.

26.     In 2014, OFS International purchased IPSCO's field services operations and accessories and tools manufacturing businesses, thereby creating OFS&T, another wholly-owned subsidiary.  At that time, OFS&T and Ultra entered into the Sales Agreement and Manufacturing

Agreement. In 2016 and 2018, Ultra and OFSi entered into the Second and Third Sales Agreements and the Second and Third Manufacturing Agreements.

27.     OFS&T also became a licensed manufacturer and seller of certain IPSCO products and a field service provider for products with IPSCO connections.

28.     Beginning in February 2018, OFSi administered and coordinated the activities of all authorized field service representatives licensed to service IPSCO products.

29.     OFSi has been one of seven certified IPSCO service providers authorized to provide running services in several states, including Texas, Louisiana, and Oklahoma. Although OFSi was initially only one of many entities licensed to use IPSCO's proprietary thread designs, that relationship changed significantly in 2016 with the execution of the agreements discussed in more detail below. Under those agreements, OFSi became the only third party with a license to use IPSCO connections on a full range of products.

30.     In addition, OFSi has manufactured IPSCO designed connections on OCTG and sold the resulting products in several states. Historically, a vast majority of OFSi's business has been related to IPSCO Tubulars Inc. and its subsidiaries, including Ultra.

31.     From the time of its initial creation in 2012 until very recently, OFSi and IPSCO have been under common ownership. In September 2016, Konstantin Semerikov acquired a majority interest of OFSi from OFSi and IPSCO's common owner. In June 2019, Mr. Semerikov acquired the remaining interest in OFSi.

32.     From OFSi's founding, the parties' close working relationship and common ownership and control have been common knowledge in the industry. Because of this relationship

and OFSi's business, many industry participants have equated the two companies, even after they were no longer under common ownership.

**Agreements between IPSCO and OFSi**

33.     OFSi desired access and use of some of IPSCO's intellectual property, designs, and confidential design information.  Therefore, shortly after its creation, on April 25, 2013, TPM entered the Original Manufacturing Agreement with Ultra.  Pursuant to the Original Manufacturing Agreement, Ultra gave TPM access to its intellectual property, designs, and confidential information.

34.     Around the time of its creation, on June 30, 2014, Ultra and OFS&T entered into the Sales Agreement and Manufacturing Agreement, which gave it access to Ultra's (then existing) full range of products.

35.     On December 12, 2016, Ultra and OFSi (including TPM and OFS&T) entered into the Second Sales Agreement and the Second Manufacturing Agreement, which gave OFSi access to additional connections.  On December 11, 2018, Ultra and OFSi entered into the Third Sales Agreement and Third Manufacturing Agreement, which are similar to the Second Sales Agreement and Second Manufacturing Agreement, and relate to the sales and manufacturing of a new series of IPSCO products marketed under the federally registered "TORQ" trademark.  Third Sales Agreement, Ex. 5 at Exhibit A; Third Manufacturing Agreement, Ex. 6 at Exhibit A.

36.     Ultra granted OFSi "a non-exclusive, non-transferable, terminable, revocable, license (without the right to sublicense)" in and to certain Licensed Technology.  Manufacturing Agreement, Ex. 2 at ¶ 2.1; Second Manufacturing Agreement, Ex. 4 at ¶ 2.1; Third Manufacturing Agreement, Ex. 6 at ¶ 2.1.

37. Ultra also gave OFSi the right to manufacture, thread, and repair Licensed Products, which are identified in an attachment to the agreements. OFSi specifically acknowledged that "it acquire[d] no right, title or interest in and to either the Licensed Technology or the Licensed Trademark." Manufacturing Agreement, Ex. 2 at ¶ 2.3; Second Manufacturing Agreement, Ex. 4 at ¶ 2.3; Third Manufacturing Agreement, Ex. 6 at ¶ 2.3.

38. Ultra expressly prohibited OFSi from manufacturing any Licensed Product under any other name. Manufacturing Agreement, Ex. 2 at ¶ 4.1; Second Manufacturing Agreement, Ex. 4 at ¶ 4.1; Third Manufacturing Agreement, Ex. 6 at ¶ 4.1.

39. Under the Sales Agreement, Second Sales Agreement, and Third Sales Agreement, Ultra granted OFSi a license (1) "to market, distribute, offer for sale and sell the Licensed Product in the Licensed Distribution Territory" and (2) "in and to the Licensed Technology for use only in connection with the marketing, distribution and sale of Licensed Product in the Licensed Distribution Territory." Sales Agreement, Ex. 1 at ¶ 2.1; Second Sales Agreement, Ex. 3 at ¶ 2.1; *see also*, Third Sales Agreement, Ex. 5 at ¶ 2.1.

40. Under the terms of the Sales Agreement, Second Sales Agreement, and Third Sales Agreement, OFSi must report and pay monthly royalties to IPSCO for the sales of all Licensed Products. Sales Agreement, Ex. 1 at ¶¶ 3.1-3.4; Second Sales Agreement, Ex. 3 at ¶¶ 3.1-3.4; Third Sales Agreement, Ex. 5 at ¶¶ 3.1-3.4.

41. Because OFSi would be granted full access to all of Ultra's proprietary product drawings, technical specifications, and other confidential and trade secret information, the Agreements also contain Confidentiality and Non-Use provisions. Sales Agreement, Ex. 1 at ¶¶ 7.1-7.5; Manufacturing Agreement, Ex. 2 at ¶¶ 6.1-6.6; Second Sales Agreement, Ex. 3 at ¶¶ 7.1-7.5; Second Manufacturing Agreement, Ex. 4 at ¶¶ 6.1-6.5; Third Sales Agreement, Ex. 5

at ¶¶ 7.1-7.5; Third Manufacturing Agreement, Ex. 6 at ¶¶ 6.1-6.5. Under the Sales Agreements and Manufacturing Agreements, Confidential Information is defined as all "information, whether written or oral, which is designated by Ultra as 'Confidential' or which is proprietary or confidential in nature including, without limitation, the Licensed Technology. . . ." Sales Agreement, Ex. 1 at ¶ 1.2; Manufacturing Agreement, Ex. 2 at ¶ 1.2; Second Sales Agreement, Ex. 3 at ¶ 1.2; Second Manufacturing Agreement, Ex. 4 at ¶ 1.2; Third Sales Agreement, Ex. 5 at ¶ 1.2; Third Manufacturing Agreement, Ex. 6 at ¶ 1.2. Pursuant to the Agreements, Confidential Information includes all materials, whether print, electronic, or otherwise given to OFSi that embody the Licensed Technology. Sales Agreement, Ex. 1 at ¶ 1.2; Manufacturing Agreement, Ex. 2 at ¶ 1.2; Second Sales Agreement, Ex. 3 at ¶ 1.2; Second Manufacturing Agreement, Ex. 4 at ¶ 1.2; Third Sales Agreement, Ex. 5 at ¶ 1.2; Third Manufacturing Agreement, Ex. 6 at ¶ 1.2.

42.     OFSi warranted and agreed that it was prohibited from using IPSCO's Confidential Information, including trade secrets, for itself or others and would not disclose the Confidential Information. Furthermore, OFSi agreed that it would use the Confidential Information "for the sole and limited purpose of exercising its rights and performing its obligations" under the Agreements. Sales Agreement, Ex. 1 at ¶ 7.3; Manufacturing Agreement, Ex. 2 at ¶ 6.4; Second Sales Agreement, Ex. 3 at ¶ 7.3; Second Manufacturing Agreement, Ex. 4 at ¶ 6.3; Third Sales Agreement, Ex. 5 at ¶ 7.3; Third Manufacturing Agreement, Ex. 6 at ¶ 6.3.

43.     Furthermore, OFSi warranted and agreed that "Ultra owns all right, title, and interest in, to, and under the Licensed Technology, any Licensed Trademark, and Improvements thereto." Sales Agreement, Ex. 1 at ¶ 6.1; Manufacturing Agreement, Ex. 2 at ¶ 5.1; Second Sales

Agreement, Ex. 3 at ¶ 6.1; Second Manufacturing Agreement, Ex. 4 at ¶ 5.1; Third Sales

Agreement, Ex. 5 at ¶ 6.1; Third Manufacturing Agreement, Ex. 6 at ¶ 5.1.  As such,

> [a]ny Improvements in or to any of the Licensed Technology shall be the sole and exclusive property of ULTRA, and ULTRA shall own any and all right, title, and interest in, to and under, such Improvements.  [OFSi] agrees to assign and hereby does assign to ULTRA any and all right, title, and interest, in, to, and under any such Improvements to any of the Licensed Technology subject to [OFSi's] licensed right to use same on the terms and conditions herein.

Sales Agreement, Ex. 1 at ¶ 6.2; Manufacturing Agreement, Ex. 2 at ¶ 5.2; Second Sales

Agreement, Ex. 3 at ¶ 6.2; Second Manufacturing Agreement, Ex. 4 at ¶ 5.2; Third Sales

Agreement, Ex. 5 at ¶ 6.2; Third Manufacturing Agreement, Ex. 6 at ¶ 5.2.

44.     Additionally, on July 31, 2014, IPSCO Tubulars Inc. entered into separate Non-

Disclosure and Confidentiality Agreements with OFS International and OFS&T to further solidify

the business relationship between the entities.

45.     Pursuant to the NDAs, OFS International and OFS&T agreed "to hold in confidence

any and all information furnished by [IPSCO Tubulars] to [OFS International and OFS&T] . . .

only for the purpose of evaluating the potential business relationship with [IPSCO Tubulars] and

performing any obligations pursuant to such business relationship . . . ."

46.     Furthermore, under the NDAs, OFS International and OFS&T warranted and

agreed that they "shall direct [their] directors, officers, employees, agents, partners and

representatives (collectively, "Representatives") not to, disclose the Confidential Information."

They further agreed "to exercise all precautions reasonably necessary to safeguard the secrecy of

the Confidential information" and would "remain responsible for any improper disclosure of

Confidential Information by such Representatives."

47.     Under the Agreements, OFSi agreed that IPSCO would be entitled to temporary

and permanent injunctive relief if OFSi breached any material term of the Agreements.  Sales

Agreement, Ex. 1 at ¶ 14.3; Manufacturing Agreement, Ex. 2 at ¶ 13.3; Second Sales Agreement, Ex. 3 at ¶ 14.3; Second Manufacturing Agreement, Ex. 4 at ¶ 13.3; Third Sales Agreement, Ex. 5 at ¶ 14.3; Third Manufacturing Agreement, Ex. 6 at ¶ 13.3.

**OFSi Breaches and Uses IPSCO's Confidential Information**

48.     Pursuant to the Agreements, IPSCO gave OFSi access to its trade secrets, including design and manufacturing information for IPSCO Products found in manufacturing drawings, tolerance sheets, inserts, overlays, swage tools, technical specifications, procedures, work instructions, design models, CAD files, design spreadsheets, FEA processes, CNC programs and scripts for automation, and test reports.

49.     IPSCO recently discovered that OFSi is selling products under its own name that are identical or nearly identical to the IPSCO products that OFSi has been manufacturing and selling pursuant to the Agreements.  And IPSCO recently discovered that OFSi and Fermata have used IPSCO's trade secrets to design OFSi Products, related to, at a minimum, the following IPSCO products: the BPN, SF, TORQ SFW, TORQ DQW, FJ, and DQX.

50.     As one example, the first product brought to IPSCO's attention was an OFSi 5" CYHP BHT connection.  An examination of the OFSi 5" 18# P-110 CYHP BHT connection technical data sheet shows that its specifications are nearly identical to the IPSCO UP BPN P-110 CYHP.  *Compare* OFSi P-110 CYHP BHT Technical Data Sheet, attached as Ex. 7, *with* IPSCO UP BPN P-110 CYHP Performance Data Sheet, attached as Ex. 8.  An examination of the respective technical data sheets further shows OFSi copied the image of the product from IPSCO's Performance Data Sheet.

51.     The OFSi BHT connection is so similar to the IPSCO UP BPN connection that even OFSi confused the products.  On a Field Service Weekly Activity Report, OFSi identified the BHT

as an IPSCO connection. The OFSi BHT connection and the IPSCO UP BPN connection are nearly identical, if not identical, and OFSi itself cannot distinguish between the products. Customers have also confused the IPSCO UP BPN connection and the OFSi BHT connection.

52. OFSi has similarly manufactured, marketed, sold, and installed numerous other products under its own name that, upon information and belief, are identical, nearly identical, or substantially similar to Ultra Licensed Products as defined under the Agreements. The OFSi Products based on Ultra's trade secrets include, at least, the following product lines: BHT, BHT-S, Reaper-SF, Python SF, Python DC, Warthog DC (formerly known as the DKC), and any OFSi Product which is based on, similar to, or has characteristics of the Ultra FJ ("breaching products"). Based upon information and belief, OFSi has used IPSCO's trade secrets to design other connections.

53. In addition to having access to IPSCO's trade secrets OFSi has capitalized on two of IPSCO's former employees with knowledge of IPSCO's confidential information to further expedite its connection design process. Doug Dunford, OFSi's Director of Product Development, admits to knowing the comparable Ultra DQX connection backwards and forward. In fact, while at IPSCO, Dunford was responsible for approving Ultra DQX manufacturing drawings. Now at OFSi, Dunford is the primary designer of the Warthog DC, OFSi's correlating product. Engineer Ryan Broussard participated in development meetings and had access to IPSCO's most sensitive confidential design information during his time at IPSCO. During these development meetings, Ultra connections, including the TORQ SFW, were discussed. Once he began working at OFSi, where he was first hired as OFSi's "marketing strategist" and now works as a design engineer, he claims to have designed the Python SF (based on the TORQ SFW, a connection that took Ultra over two years to design) within a few days.

54.     OFSi has based, at a minimum, the BHT, BHT-S, Reaper-SF, Python SF, Python DC, and Warthog DC on IPSCO's confidential information, thereby gaining a head start.

55.     OFSi's breaching products have caused confusion within the industry. Several of IPSCO's customers have inquired about the breaching products believing they are IPSCO products. OFSi has capitalized upon this confusion by selling breaching products to IPSCO customers.

56.     OFSi has misappropriated IPSCO's confidential, proprietary, and trade secret information for use in designing, manufacturing, selling, and installing connections and tubular products as OFSi products.

57.     By misappropriating IPSCO's confidential information, and using IPSCO's confidential information to design, manufacture, sell, and install OFSi products, OFSi has breached the Sales Agreement, Second Sales Agreement, Third Sales Agreement, Manufacturing Agreement, Second Manufacturing Agreement, and Third Manufacturing Agreement. Additionally, OFSi has failed to pay IPSCO all monies owed, including late fees, in breach of the Sales Agreement, Second Sales Agreement, and Third Sales Agreement.

**OFSi's Relationship with Fermata**

58.     ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

59.     ███████████████████████████████████████████
███████████████████████████████████████████████

████████████████████████████████████████████████

████████

60.  ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

**COUNT 1 – AS TO ALL DEFENDANTS**
**Violation of the Defend Trade Secrets Act (DTSA)**
**18 U.S.C. § 1836**

61.    IPSCO incorporates its allegations set forth above.

62.    IPSCO is the owner of various trade secrets related to its steel tubular goods and connection products, which are used in or intended for use in, interstate commerce.  Pursuant to the Agreements, Ultra gave OFSi access to its confidential and proprietary information, including "discoveries, concepts, ideas, formulas and compositions . . . works of authorship, know-how, manufacturing and production procedures, processes and techniques (including, without limitation, thread profiles), methods of use, research and development information, drawings, manufacturing specifications, overlays, plans and technical data." Sales Agreement, Ex. 1 at ¶ 1.9; Manufacturing Agreement, Ex. 2 at ¶ 1.8; Second Sales Agreement, Ex. 3 at ¶ 1.9; Second Manufacturing Agreement, Ex. 4 at ¶ 1.8; Third Sales Agreement, Ex. 5 at ¶ 1.9; Third Manufacturing Agreement, Ex. 6 at ¶ 1.8.  This confidential and proprietary information constitutes trade secrets within the meaning of the DTSA, 18 U.S.C. § 1839(3).

63.    IPSCO has invested and spent significant effort, energy, resources and time developing these trade secrets, which derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by,

another person who can obtain economic value from the disclosure or use of the information. The IPSCO products take years and signicant financial resources to develop.

64.     IPSCO has taken reasonable steps to maintain the confidentiality of its confidential, proprietary, and trade secret information. All of the parties' Agreements contained confidentiality provisions. Furthermore, IPSCO required OFSi to maintain written agreements prohibiting the disclosure of IPSCO confidential, proprietary, and trade secret information with all individuals involved in the use or exploitation of IPSCO's confidential, proprietary, and trade secret information. Additionally, IPSCO strictly controls physical access to its offices and facilities and maintains its confidential information, including drawings and other sensitive technical information, on separate servers to which access is carefully restricted.

65.     OFSi gained access to IPSCO's trade secrets only after it was in a confidential relationship with IPSCO and/or had signed the Agreements, thereby placing confidentiality and contractual obligations on OFSi to protect IPSCO's information. OFSi had a duty to maintain the secrecy of and limit the use of IPSCO's trade secrets.

66.     OFSi has misappropriated IPSCO's trade secrets by improperly using the trade secrets, including violations of obligations under the Agreements and under Texas state law. OFSi knew or had reason to know that its use of IPSCO's trade secrets was improper because it had a duty to limit the use of IPSCO's trade secrets. And OFSi did not have express or implied consent from IPSCO to use its trade secrets to manufacture a competing line of products. Furthermore,

██████████████████████████████████████████████████████

███████

67.     ████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████ Despite knowing that it

had improperly received IPSCO's confidential information, Fermata has improperly used IPSCO's

confidential information to design OFSi Products.

68.     The use of IPSCO's trade secrets without its consent has damaged and will

irreparably harm IPSCO.  Indeed, OFSi agrees that any breach of its obligations to protect IPSCO's

Confidential Information "will cause [IPSCO] irreparable harm and loss."  Sales Agreement, Ex.

1 at ¶ 7.2; Manufacturing Agreement, Ex. 2 at ¶ 6.2; Second Sales Agreement, Ex. 3 at ¶ 7.2;

Second Manufacturing Agreement, Ex. 4 at ¶ 6.2; Third Sales Agreement, Ex. 5 at ¶ 7.2; Third

Manufacturing Agreement, Ex. 6 at ¶ 6.2.

69.     OFSi's and Fermata's actions constitute a misappropriation under the DTSA, 18

U.S.C. § 1839(5), and entitle IPSCO to injunctive and equitable relief to protect itself against the

actual or threatened misappropriation of its trade secrets.  The misappropriation has caused and

will continue to cause damage to IPSCO and, unless restrained, will further damage IPSCO, the

nature and extent of which may not be able to be proven with certainty, irreparably injuring IPSCO,

leaving it without a remedy at law if such injunctive or equitable relief is not issued.

70.     Accordingly, preliminary and permanent injunctive relief, including the seizure of

property necessary to prevent the propagation or dissemination of IPSCO's trade secrets, is

necessary to prevent irreparable harm and further disclosure and misuse of IPSCO's trade secrets.

18 U.S.C. § 1836(b)(2)(A)(i).

71.     IPSCO is entitled to recover any unjust enrichment caused by the misappropriation

of IPSCO's trade secrets and the violation of the DTSA.  IPSCO is entitled to injunctive relief to

prevent further use and dissemination of IPSCO's trade secrets, as well as damages for actual

losses caused by the misappropriation of the trade secrets, damages for unjust enrichment,

exemplary damages, and costs. 18 U.S.C. § 1836(b)(3).  The misappropriation of IPSCO's trade secrets was willful and malicious, entitling IPSCO to exemplary and punitive damages, up to two times its actual damages, plus reasonable attorneys' fees.  18 U.S.C. § 1836(b)(3)(D).

**COUNT 2 – AS TO ALL DEFENDANTS**
**Violation of the Texas Uniform Trade Secrets Act (TUTSA)**
**Texas Civil Practice and Remedies Code § 134A.001**

72.  IPSCO incorporates its allegations set forth above.

73.  As described above, IPSCO is the owner of trade secrets.

74.  It has taken reasonable measures under the circumstances to keep its information secret.

75.  IPSCO has invested and spent significant effort, energy, resources and time developing these trade secrets, which derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

76.  OFSi had a duty to maintain the secrecy of and limit the use of IPSCO's trade secrets.

77.  OFSi has misappropriated IPSCO's trade secrets by improperly using the trade secrets, including violations of obligations under the Agreements, and under Texas state law.  OFSi knew or had reason to know that its use of IPSCO's trade secrets was improper because it had a duty to limit the use of IPSCO's trade secrets.  And OFSi did not have express or implied consent from IPSCO to use its trade secrets to manufacture a competing line of products.

78.  ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████ Despite knowing that it

had improperly received IPSCO's confidential information, Fermata has improperly used IPSCO's confidential information to design OFSi Products.

79.     OFSi and Fermata have used and will continue to intentionally use IPSCO's trade secrets to unfairly compete with IPSCO.

80.     OFSi and Fermata's conduct has been willful and malicious and results from the conscious disregard of the rights of IPSCO.  Tex. Civ. Prac. & Rem. Code § 134A.002(7).

81.     OFSi and Fermata's actions constitute a misappropriation under TUTSA, and these actions entitle IPSCO to injunctive and equitable relief to protect itself against the actual or threatened misappropriation of its trade secrets.  The misappropriation has caused and will continue to cause damage to IPSCO and, unless restrained, will further damage IPSCO, the nature and extent of which may not be able to be proven with certainty, irreparably injuring IPSCO, leaving it without a remedy at law if such injunctive or equitable relief does not issue. Accordingly, preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure and misuse of IPSCO's trade secrets.

82.     As a direct and proximate cause of OFSi and Fermata's acts, IPSCO has suffered and is likely to continue to suffer loss and damages and is entitled to restitution, compensation, exemplary damages and attorneys' fees pursuant to Texas Civil Practice and Remedies Code § 134A.001, *et seq.*, in an amount to be proven at trial.

## COUNT 3 – AS TO OFS INTERNATIONAL, TPM, AND OFS&T
### Breach of Contract

83.     IPSCO incorporates its allegations set forth above.

84.     The Sales Agreement, Second Sales Agreement, Manufacturing Agreement, Second Manufacturing Agreement, Third Sales Agreement, Third Manufacturing Agreement, OFSi NDA, and OFS&T NDA are valid, enforceable contracts.

19

85.     IPSCO has complied with and performed under the Sales Agreement, Second Sales Agreement, Manufacturing Agreement, Second Manufacturing Agreement, Third Sales Agreement, Third Manufacturing Agreement, OFSi NDA, and OFS&T NDA.

**The Manufacturing Agreements**

86.     The Manufacturing Agreement (entered into by Ultra and OFS&T), Second Manufacturing Agreement (entered into by Ultra, OFS International, TPM, and OFS&T), and Third Manufacturing Agreement (entered into by Ultra, OFS International, TPM, and OFS&T) (collectively, the "Manufacturing Agreements") expressly prohibit OFSi from manufacturing any Licensed Product (*e.g.*, the BPN connection) under any other name.  OFS International, TPM, and OFS&T have breached the respective Manufacturing Agreements by manufacturing IPSCO Licensed Products as OFSi products (*e.g.*, the BHT connection).  Manufacturing Agreement, Ex. 2 at ¶¶ 2.1-2.4, ¶ 4.1; Second Manufacturing Agreement, Ex. 4 at ¶¶ 2.1-2.4, ¶ 4.1; Third Manufacturing Agreement, Ex. 6 at ¶¶ 2.1-2.6, ¶ 4.1.

87.     Furthermore, OFSi warranted and acknowledged that it was prohibited from using IPSCO's confidential and/or trade secret information for itself or others.  Furthermore, OFSi agreed that it would use the Confidential Information "for the sole and limited purpose of exercising its rights and performing its obligations" under the Agreements.  Manufacturing Agreement, Ex. 2 at ¶ 6.4; Second Manufacturing Agreement, Ex. 4 at ¶ 6.3; Third Manufacturing Agreement, Ex. 6 at ¶ 6.3.  As described above, OFS International, TPM, and OFS&T have breached the confidentiality provisions in the Manufacturing Agreements by using IPSCO's confidential information to manufacture and market competing products under OFSi's name and brands.

88.     The Manufacturing Agreements also require OFS International, TPM, and OFS&T to return or destroy IPSCO's Confidential Information.  Manufacturing Agreement, Ex. 2 at ¶¶ 6.4, 11.4; Second Manufacturing Agreement, Ex. 4 at ¶¶ 6.3, 11.4; Third Manufacturing Agreement, Ex. 6 at ¶¶ 6.4, 11.4.  OFSi has not done so.  For example, it states that it has quarantined certain computers instead of certifying that it has returned or destroyed IPSCO's Confidential Information as required under the Agreements.

89.     Last, the Manufacturing Agreements provide that Ultra owns any improvements OFS International, TPM, and OFS&T makes to the Licensed Technology.  Manufacturing Agreement, Ex. 2 at ¶¶ 5.1-5.2; Second Manufacturing Agreement, Ex. 4 at ¶¶ 5.1-5.2; Third Manufacturing Agreement, Ex. 6 at ¶¶ 5.1-5.2.  Instead of giving Ultra the improvements to the Licensed Technology, as required under the Manufacturing Agreements, OFSi has begun selling and manufacturing them as their own products.

**The Sales Agreements**

90.     The Sales Agreement (entered into by Ultra and OFS&T), Second Sales Agreement (entered into by Ultra, OFS International, TPM, and OFS&T), and Third Sales Agreement (entered into by Ultra, OFS International, TPM, and OFS&T) (collectively, the "Sales Agreements") each contain confidentiality provisions.  Sales Agreement, Ex. 1 at ¶¶ 7.1-7.5; Second Sales Agreement, Ex. 3 at ¶¶ 7.1-7.5; Third Sales Agreement, Ex. 5 at ¶¶ 7.1-7.5.  OFSi warranted and acknowledged that it was prohibited from using IPSCO's Confidential Information for itself or others.  Furthermore, OFSi agreed that it would use the Confidential Information "for the sole and limited purpose of exercising its rights and performing its obligations" under the Agreements.  Sales Agreement, Ex. 1 at ¶ 7.3; Second Sales Agreement, Ex. 3 at ¶ 7.3; Third Sales Agreement, Ex. 5 at ¶ 7.3.  As described above, OFS International, TPM, and OFS&T have breached the

confidentiality provisions in the Sales Agreements by using IPSCO's Confidential Information to manufacture and market competing products under OFSi's name and brands.

91.     The Sales Agreements also require OFS International, TPM, and OFS&T to return or destroy IPSCO's Confidential Information. Sales Agreement, Ex. 1 at ¶¶ 7.3, 12.5; Second Sales Agreement, Ex. 3 at ¶¶ 7.3, 12.5; Third Sales Agreement, Ex. 5 at ¶¶ 7.3, 12.5. OFSi has not done so. For example, it states that it has quarantined certain computers instead of certifying that it has returned or destroyed IPSCO's Confidential Information as required under the Agreements.

92.     Last, the Sales Agreements provide that Ultra owns any improvements OFS International, TPM, and OFS&T makes to the Licensed Technology. Sales Agreement, Ex. 1 at ¶¶ 6.1-6.2; Second Sales Agreement, Ex. 3 at ¶¶ 6.1-6.2; Third Sales Agreement, Ex. 5 at ¶¶ 6.1-6.2. Instead of giving the improvements to the Licensed Technology, as required under the Sales Agreements, OFSi has begun selling and manufacturing them as their own products.

93.     Additionally, OFSi failed to timely make royalty payments to IPSCO, in breach of the Sales Agreements. Sales Agreement, Ex. 1 at ¶¶ 3.1-3.4; Second Sales Agreement, Ex. 3 at ¶¶ 3.1-3.4; Third Sales Agreement, Ex. 5 at ¶¶ 3.1-3.4. OFSi owes Ultra late fees owed under the Sales Agreements that continue to accrue.

94.     Because money damages are insufficient to make IPSCO whole and adequately protect IPSCO against further harm, IPSCO is entitled to specific performance of the Agreements, including the Confidentiality and Non-Use provisions, and preliminary and permanent injunctive relief prohibiting any further breaches of the Agreements by OFSi.

95.     IPSCO is entitled to recover direct and consequential damages as a result of these breaches. OFSi is also liable to IPSCO for reasonable and necessary attorneys' fees incurred for

the preparation and trial of this claim, plus additional sums in the event of an appeal, as provided by the Agreements. Sales Agreement, Ex. 1 at ¶ 11.1; Manufacturing Agreement, Ex. 2 at ¶ 10.1; Second Sales Agreement, Ex. 3 at ¶ 11.1; Second Manufacturing Agreement, Ex. 4 at ¶ 10.1; Third Sales Agreement, Ex. 5 at ¶ 11.1; Third Manufacturing Agreement, Ex. 6 at ¶ 10.1.

## CONDITIONS PRECEDENT

96.     All conditions precedent to the filing of this cause of action have been satisfied.

## ATTORNEYS' FEES

97.     IPSCO seeks to recover all reasonable and necessary costs and fees incurred in connection with this lawsuit and through all levels of appeal, including attorneys' fees, costs, and expert witness fees, under all applicable law.

98.     IPSCO is also entitled to recover its attorneys' fees under the provisions of the Sales Agreement, Second Sales Agreement and Third Sales Agreement as set out in ¶ 11.1, and under the provisions of the Manufacturing Agreement, Second Manufacturing Agreement and Third Manufacturing Agreement as set out in Section ¶ 10.1, which provides: "Licensee agrees to indemnify, defend and hold harmless ULTRA and its partners, officers, employees, and agents, and the partners, members, directors, officers, employees and agents of parent companies and affiliates of ULTRA (each an "ULTRA Indemnitee") from and against any and all claims, demands, losses, damages, penalties, costs or expenses (including reasonable attorneys' and expert witness' fees and costs) of any kind or nature (each, a "Liability"), arising from or relating to: (a) any unauthorized use of information provided by ULTRA to Licensee; (b) any violation or breach by Licensee of any representation, warranty, covenant or agreement made by Licensee pursuant to this Agreement, . . . and (c) actions for negligence, intentional tort, or the like, relating to Licensee's marketing, distribution, offer for sale or sale of any Licensed Product."

99.     IPSCO requests a trial by jury of all triable issues in this action.

**PRAYER FOR RELIEF**

WHEREFORE, IPSCO prays for an Order and Judgment as follows:

a.      Actual damages;

b.      Exemplary damages;

c.      Attorneys' fees;

d.      Costs and other fees;

e.      Specific performance of the Agreements;

f.      Permanent injunctive relief prohibiting Defendants OFS International LLC, Oilfield Services and Technologies LLC, Threading and Precision Manufacturing, LLC, Fermata Technologies, LLC, and each of their members, officers, agents, employees, and those persons in active concert or participation with them, whether acting directly or through any entity, corporation, subsidiary, division, affiliate or other device from:

     i. Using or disclosing Confidential Information obtained from IPSCO pursuant to the Agreements or the parties' confidential relationship. IPSCO's Confidential Information is defined as all information regarding or reflecting the design, manufacture, or specifications of IPSCO's Licensed Products pursuant to the Agreements;

    ii. Using, sharing, summarizing, discussing or communicating in any manner concerning or otherwise making use of any of IPSCO's Confidential Information in any form and manufacturing products that are substantially similar to IPSCO's Licensed Products, including, but not limited to, the BHT, BHT-S, Reaper-SF,

Python SF, Python DC, and Warthog DC, and any connection which is based on, similar to, or has characteristics of the Ultra FJ. OFSi is further enjoined from directly or indirectly marketing, selling, or providing field services for these same products; and

    iii. OFSi and Fermata shall return all of IPSCO's Confidential Information to counsel for IPSCO and shall not further possess, use, access or disclose IPSCO's Confidential Information; and

g.    All other relief, at law or equity, to which IPSCO may be entitled.

Dated: December 30, 2019

Respectfully submitted,

/s/    *Winstol D. Carter, Jr.*
Winstol D. Carter, Jr.
State Bar No. 03932950
Southern District of Texas No. 2934
*winn.carter@morganlewis.com*
1000 Louisiana Street, Suite 4000
Houston, Texas 77002-5006
T. 713.890.5000
F. 713.890.5001

***Attorney in Charge for Plaintiff Ultra
Premium Services, LLC d/b/a TMK IPSCO
and IPSCO Tubulars Inc. d/b/a TMK IPSCO***

OF COUNSEL:

**MORGAN, LEWIS & BOCKIUS LLP**

C. Erik Hawes
State Bar No. 24042543
Southern District of Texas No. 34000
*erik.hawes@morganlewis.com*

William R. Peterson
State Bar No. 24065901
Southern District of Texas No. 1035932
*william.peterson@morganlewis.com*

Ethel J. Johnson
State Bar No. 10714050
Southern District of Texas No. 14155
*ethel.johnson@morganlewis.com*

Claire Swift Kugler
State Bar No. 00797530
Southern District of Texas No. 21675
*claire.kugler@morganlewis.com*

Archis (Neil) V. Ozarkar
State Bar No. 24079096
Southern District of Texas No. 2292399
*neil.ozarkar@morganlewis.com*

Veronica J. Lew
State Bar No. 24082110
Southern District of Texas No. 2303787
*veronica.lew@morganlewis.com*

Elizabeth M. Chiaviello
State Bar No. 24088913
Southern District of Texas No. 3097493
*elizabeth.chiaviello@morganlewis.com*

Cullen Pick
State Bar No. 24098260
Southern District of Texas No. 3257789
*cullen.pick@morganlewis.com*

## CERTIFICATE OF SERVICE

I certify that on December 30, 2019, I served a copy of the foregoing document on counsel of record for Defendants via the Court's ECF system.

 /s/ Winstol D. Carter, Jr.
Winstol D. Carter, Jr.